**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

JOSHUA C. HINTON,                              *

      Plaintiff,                              *

v.                                            *          **Case No. GJH-19-3334**

CHAD CHRONISTER, *et al.*,                     *

      Defendants.                             *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Joshua C. Hinton, a former state inmate,[1] brings this civil rights action against Defendants Correctional Officer II Chad Chronister,[2] and Eastern Correctional Institution ("ECI"). ECF No. 1. Hinton claims Defendants failed to protect him from harm in violation of the Eighth Amendment. *See id*. Pending before the Court is Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 13. Hinton was notified of his right to oppose the motion, ECF No. 14, but has filed nothing further in the case. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the following reasons, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment is granted.

## I.    BACKGROUND

### A.  Plaintiff's Allegations

In his unverified Complaint, Hinton states that on September 19, 2019, while housed at ECI, his cellmate, Purnell Oliver, made several sexual advances which Hinton refused. ECF No.

---

[1] *See* ECF No. 5 (informing the Court of a change of address).

[2] The Clerk shall amend the docket to reflect the correct spelling of Defendant's name.

1 at 4;[3] ECF No. 1-2 at 1.[4] Oliver got mad and left the cell to retrieve a knife. ECF No. 1 at 4;

ECF No. 1-2 at 1. At approximately 11:10 a.m., Oliver returned to the cell followed by Officer

Chad Chronister. ECF No. 1-2 at 1. Oliver then began stabbing and hitting Hinton. *Id.* Scared

and panicked, Chronister shut the cell door, locking Oliver and Hinton in together. *Id.* at 1–2.

Chronister then called a code into the radio. *Id.* at 1. Another officer arrived at the cell and

sprayed Oliver with mace, handcuffed both inmates, and they were taken to the medical unit.

ECF No. 1 at 4.

      As relief, Hinton seeks monetary damages, a policy on sexual assault victim's access to

the Prison Rape Elimination Act Process ("PREA") and telephones after making a complaint of

sexual assault, and the right to file charges against Oliver. *Id*.

### B. Defendants' Response

      The material facts are not in dispute. On September 19, 2019, Officer Chronister was

assigned to Housing Unit 8, C-Tier, where Hinton and Oliver were assigned. ECF No. 13-2 at 4–

5. At approximately 11:10 a.m., Chronister saw Oliver walking quickly down the tier and

ordered him to stop, but Oliver did not comply. *Id*.; *see also* ECF No. 13-3 ¶ 7. Chronister went

to Oliver's cell and saw Oliver striking his cellmate, Hinton. ECF No. 13-2 at 4–5; ECF No. 13-3

¶ 8. Chronister also saw that Oliver had a homemade weapon in his hand. ECF No. 13-2 at 4–5;

ECF No. 13-3 ¶ 9. Chronister then called for assistance on his radio and gave both inmates

commands to stop fighting. ECF No. 13-2 at 4–5. C.O. II William Campion responded and

ordered the inmates to stop fighting, threatening that if they failed to comply, he would use

---

[3] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

[4] Unless stated otherwise, all facts are taken from Plaintiff's Complaint or documents attached to and relied upon in the Complaint and are presumed to be true. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

pepper spray. ECF No. 13-2 at 4–5; ECF No. 13-3 ¶ 12. The inmates complied, and Oliver

dropped the weapon. ECF No. 13-2 at 4–5. Both inmates were handcuffed and taken to the

medical unit. ECF No. 13-2 at 4–5; ECF No. 13-3 ¶ 12.

Chronister denies being aware of any altercation between Hinton and Oliver prior to the

assault. ECF 13-3 ¶ 6. Chronister avers that, when he saw Oliver draw his hand back as if to

strike Hinton, he intended to intervene, but when he saw the homemade knife, he did not

intervene out of fear for death or significant injury, as he was alone and outnumbered by the two

inmates, and the cell was a small, confined area. *Id*. ¶ 9. Further, Chronister had been trained not

to intervene alone in a fight between inmates. *Id*. ¶ 10. While Chronister waited for back-up to

arrive, for security reasons, "control was maintained of the cell door between the inmates and

himself." *Id*. ¶ 11. Additionally, Chronister avers that Hinton did not report to him that he was

sexually assaulted. *Id*. ¶ 13. Chronister denies ever preventing or delaying Hinton from

contacting the PREA hotline. *Id*. ¶ 14.

In response to the assault, Campion wrote a Notice of Incident/Matter of Record. ECF

13-2 at 10. Campion reported that he responded to a 10-10 call from 8C tier, Cell #16. *Id*. When

he arrived, Campion saw Oliver with his back to the door and a sharp pointed object in his right

hand. *Id*. Hinton was bleeding from the left side of his neck. *Id*. Oliver threw the weapon to the

floor, backed out of the cell, and Chronister handcuffed him. *Id*. Campion handcuffed Hinton and

retrieved the weapon. *Id*.

Hinton was immediately assessed in the medical department by Stephanie Cyran, N.P.

ECF No. 13-2 at 11. Hinton was alert and oriented but had "blood oozing from a 2.5 cm

laceration" on the left side of his neck. *Id.* He was stable and able to be treated at the facility. *Id*.

Oliver was also assessed by medical, however he denied the need for medical attention. *Id*. at 12.

No visible injuries, redness, bruising, or bleeding were observed. *Id*.

On the day of the assault both Hinton and Oliver refused to make a written statement or to sign an ECI statement form. ECF No. 13-2 at 15–16. However, Oliver reportedly told Duty Officer J. Brengle that he and Hinton had been arguing for a while, that Oliver had had enough, and that Oliver then punched Hinton and walked out. ECF No. 13-4 at 4. Oliver further reported that he heard someone yell: "I've got two strips for anyone who gets him" and then went back to the cell because he wanted to, "get him before they get me." *Id.*

As a result of the assault, Oliver was issued a Notice of Inmate Rule Violation and entered a plea agreement on October 7, 2019, which resulted in his being sanctioned with a loss of 60 days good conduct credits, 60 days of segregation, and 60 days of no visitation. ECF 13-2 at 21–26. Hinton was initially also charged with a rule violation, but the facility declined to pursue the charges after it was determined that he was the victim of an attack. *Id*. at 27–31. As a result of the assault, Hinton declared Oliver as an enemy. *Id*. at 20.

Sgt. D. Marquette from Internal Investigation Division ("IID") was assigned to investigate the assault. He responded to ECI on October 23, 2019, and retrieved the weapon used in the assault. ECF No. 13-4 at 5. On November 13, 2019, he interviewed Chronister, and he interviewed Hinton on November 25, 2019, *Id.* at 5–6. Hinton wanted Oliver to be prosecuted. *Id.* at 6. Marquette also attempted to interview Oliver on November 25, 2019, but Oliver declined to be interviewed. *Id.* On November 27, 2019, Marquette obtained a criminal summons for Oliver charging him with second degree assault, possession of contraband, and possession of a dangerous weapon. *Id*. at 6, 8–11.

### C. Procedural History

Hinton filed Administrative Remedy Procedure Case No. ECI-1457-19 on September 26,

2019, concerning the assault. ECF No. 13-2 at 32–34. The ARP was dismissed on September 27, 2019, with the following explanation: "Inmates not may not seek relief through the Administrative Remedy Procedure regarding Disciplinary proceeding procedures and decisions." *Id*. at 35.[5] Hinton appealed the dismissal to the Commissioner of Corrections on October 23, 2019. ECF No. 13-5 at 2–7. The ARP was returned to the ECI ARP Coordinator on October 24, 2019, with an explanation that "I have reviewed your decision and do not concur with your rationale for the dismissal for procedural reasons" and an instruction to "[p]lease review your rationale for dismissal." *Id.* at 8. The ARP was then dismissed again on October 30, 2019, this time due to an ongoing IID investigation. ECF No. 13-2 at 32. On November 5, 2019, Hinton filed a second ARP as a "Warden's Appeal," contesting the first ARP's dismissal. *Id.* at 39–42. The second ARP was dismissed as repetitive on November 12, 2019. *Id.* at 39. Hinton also sent a letter to the Commissioner of Corrections on November 10, 2019, ECF No. 13-5 at 9–10, but the Office of the Commissioner responded on November 19, 2019, indicating that it was unable to process the letter because it was unclear what Hinton was requesting and instructing him on how to file an appeal, if that was his aim, *id.* at 11.

According to a letter Hinton wrote on January 29, 2020, he submitted an appeal to the Inmate Grievance Office ("IGO") on December 1, 2019, but it was returned as not deliverable on January 28, 2019. ECF No. 13-6 at 4. He thus resubmitted the appeal on January 29, 2019. *Id.*; *see also id.* at 6–11. On March 11, 2020, the IGO dismissed the grievance for failure to state a claim and noted that an IID investigation was open, and in order to avoid inconsistent

---

[5] Hinton submitted another ARP on October 12, 2019, ARP- ECI-1556-19, questioning why he remained on segregation when the notice of inmate rule violation regarding the assault was dismissed. ECF No. 13-2 at 38. The ARP was dismissed on October 14, 2019, with a request that Hinton indicate what remedy was sought. *Id.*

adjudications, the IGO would not further consider the claim while it remained pending before the IID. *Id*. at 20. Hinton was advised that the dismissal was without prejudice and could be administratively reopened if Hinton disagreed with the findings of the IID investigation. *Id*. Hinton's subsequent request for review of DPSC's decision was dismissed by the Circuit Court for Somerset County on August 17, 2020. *Id*. at 23.

Plaintiff filed suit against Chronister and ECI on November 18, 2019. ECF No. 1. Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, on September 2, 2020. ECF No. 13. A Rule 12/56 Notice was mailed to Plaintiff on the same day, ECF No. 14, but Plaintiff has not filed a response to Defendants' motion.

## II.    STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

The purpose of Rule 12(b)(6) "'is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). When deciding a motion to dismiss under Rule 12(b)(6), a court "must accept as true all of the factual allegations contained in the complaint," *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (quoting

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and "draw all reasonable inferences in favor of the plaintiff," *id.* (quoting *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009)). The Court need not, however, accept unsupported legal allegations, *see Revene v. Charles Cty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *Papasan v. Allain*, 478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters of Norfolk v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

Defendants' Motion is styled as a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. If the Court considers materials outside the pleadings, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id*. When the moving party styles its motion as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," as is the case here, and attaches additional materials to its motion, the nonmoving party is, of course, aware that materials outside the pleadings are before the Court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre-or post-discovery).

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c)(1)(A), show that

there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

While the Court may rule on a motion for summary judgment prior to commencement of discovery, *see, e.g.*, *Demery v. Extebank Deferred Comp. Plan (B)*, 216 F.3d 283, 286 (2d Cir. 2000), Federal Rule of Civil Procedure 56(d) "mandates that summary judgment be denied when the nonmovant 'has not had the opportunity to discover information that is essential to his opposition[,]'" *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014) (quoting *Ingle ex rel. Estate of Ingle v. Yelton*, 439 F.3d 191, 195 (4th Cir. 2006)). "To obtain Rule 56(d) relief, the non-moving party bears the burden of showing how discovery could possibly create a genuine issue

of material fact sufficient to survive summary judgment or otherwise affect the court's analysis." *Neal v. Luedtke*, 713 F. App'x 177, 181 (4th Cir. 2017) (citing *Poindexter v. Mercedes-Benz Credit Corp.*, 792 F.3d 406, 411 (4th Cir. 2015)).

Finally, where, as here, the plaintiff is proceeding *pro se*, the Court reads the pleadings generously. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (finding a *pro se* complaint should be "liberally construed" and that, "'however inartfully pleaded,'" the complaint "must be held to 'less stringent standards than formal pleadings drafted by lawyers'" (quoting *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972)). At the same time, the Court must also fulfill its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## III.   DISCUSSION

### A.  Exhaustion

#### 1.  Mandatory Exhaustion Under the Prisoner Litigation Reform Act

Defendants first argue that Plaintiff's § 1983 claim must be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act ("PRLA") prior to filing his Complaint. ECF No. 13-1 at 10. The PRLA provides, in pertinent part:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or

adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *see Chase v. Peay*, 286 F. Supp. 2d 523, 527 (D. Md. 2003), *aff'd*, 98 Fed. App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading requirement on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. *See Jones v. Bock*, 549 U.S. 199, 215–216 (2007); *Anderson v. XYZ Correctional Health Services, Inc.*, 407 F.2d 674, 682 (4th Cir. 2005).

Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." *Woodford v. Ngo*, 548 U.S. 81, 88 (2006). Additionally, an inmate must complete the prison's internal appeals process before bringing suit. *See Jones*, 549 U.S. at 202 (noting the PLRA requires prisoners to exhaust prison grievance procedures before filing suit); *see also Girard v. Chuttey*, 826 F. App'x 41, 44–45 (2d Cir. 2020) ("Because Girard filed his initial complaint in this action before the CORC had either decided his appeal or the thirty-day period to respond had elapsed, he failed to exhaust his remedies as to this grievance."); *Mitchell v. Bishop*, No. CV PX-18-933, 2019 WL 4059902, at *4 (D. Md. Aug. 28, 2019) ("Nor can [the plaintiff] save the claims by exhausting administrative remedies while this case is pending."); *cf. Chase*, 286 F. Supp. 2d at 530 ("The critical question is not whether the Maryland prisoner grievance process currently is available to Chase, but rather whether those

remedies were available to him on July 22, 1998, at the time when he filed this suit in federal court.").

A claim that has not been exhausted may not be considered in court—"exhaustion is mandatory." *Jones*, 549 U.S. at 211, 220; *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("The mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion[.]" (quoting *Miller v. French*, 530 U.S. 327, 337 (2000))). However, "that edict contains one significant qualifier: the remedies must indeed be 'available' to the prisoner." *Ross*, 136 S. Ct. at 1856; *see* 42 U.S.C. § 1997e(a).

An administrative remedy is available if it is "'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, 136 S. Ct. at 1859 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)). However, the *Ross* Court also identified three kinds of circumstances in which an administrative remedy is unavailable, and an inmate's duty to exhaust available remedies "does not come into play." *Id*. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third circumstance arises when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

## 2.  Administrative Remedies in Maryland Prisons

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has made an "administrative remedy procedure" available to Maryland State prisoners for "inmate

complaint resolution." *See generally* Md. Code Ann., Corr. Servs. ("C.S."), §§ 10-201 *et seq.*;

Md. Code Regs. ("COMAR") 12.07.01.01(B)(1) (defining ARP). The grievance procedure

applies to the submission of grievances against Division of Correction officials or employees.

C.S. § 10-206(a).

Regulations promulgated by DPSCS concerning the administrative remedy procedure

define a "grievance" to include a "complaint of any individual in the custody of the [DOC] . . .

against any officials or employees of the [DOC] . . . arising from the circumstances of custody or

confinement." COMAR 12.07.01.01(B)(8). An inmate must exhaust the ARP process as a

condition precedent to further review of the inmate's grievance. *See* C.S. § 10-206(b); *see also*

COMAR 12.07.01.02(D).

To exhaust the ARP process, a prisoner must first file an ARP complaint with the warden

of the prison within 30 days of the incident or when the prisoner gains knowledge of the injury

giving rise to the complaint. *See* COMAR 12.02.28.09(B). Second, if the ARP complaint is

denied, or the inmate does not receive a timely response, a prisoner must file an appeal with the

Commissioner of Correction within 30 days. *See* COMAR 12.02.28.14.B(5). If the appeal is

denied, the prisoner must appeal within 30 days to the Inmate Grievance Office ("IGO"). *See*

C.S. §§ 10-206, 10-210; COMAR 12.02.28.05(E), 12.02.28.18, 12.07.01.04, 12.07.01.05(B).

Inmates may then seek judicial review of the IGO's final determinations in a Maryland Circuit

Court. C.S. § 10-210. However, "an inmate need not seek judicial review in State court in order

to satisfy the PLRA's administrative exhaustion requirement." *Aurel v. Mailroom N. Branch*, No.

CV ELH-14-2813, 2016 WL 3957647, at *8 (D. Md. July 21, 2016) (citing *Pozo v. McCaughtry*,

286 F.3d 1022, 1024 (7th Cir. 2002).

Where, as here, the ARP complaint was referred to the Intelligence and Investigative Division ("IID") and procedurally dismissed under COMAR 12.02.28.11.B(1)(h), the facility ARP coordinator is required to notify the inmate that he may appeal the dismissal to the Commissioner using the following statement:

> The request is procedurally dismissed at this level. It has been determined that the subject matter of your Request is under investigation by the Department's Intelligence and Investigative Division under case number [insert case number here] and no further action will be taken under the Administrative Remedy Procedures at this level. You may appeal this decision to the Commissioner of Correction.

COMAR 12.02.28.11(B)(2)(d).

### 3. Exhaustion of Plaintiff's Claims

Here, Hinton filed an ARP on September 26, 2019, concerning the assault, which was dismissed on September 27, 2019. ECF No. 13-2 at 32–35. Hinton appealed the dismissal to the Commissioner of Corrections on October 23, 2019. ECF No. 13-5 at 2–7. The ARP was returned to the ECI ARP Coordinator on October 24, 2019, with instructions to reconsider the basis for dismissal. *Id.* at 8. The ARP was then dismissed again on October 30, 2019, this time due to an ongoing IID investigation. ECF No. 13-2 at 32.

Courts in this District have generally found that an IID investigation renders claims either exhausted or unavailable. *See, e.g.*, *Stokes v. Davis*, No. CV JKB-16-3239, 2018 WL 656445, at *10 (D. Md. Feb. 1, 2018) ("[S]ome procedures were unavailable to [the plaintiff] due to the Defendants' misrepresentation that an IID investigation into his allegations was underway."); *Toran v. Leply*, No. CV DKC-16-3731, 2017 WL 2645727, at *4 (D. Md. June 20, 2017) ("There is no indication in either the regulations or in the response provided to Toran that further efforts to address his ARP claim would resume after the IID investigation was terminated, or that an appeal of his ARP complaint would not simply be dismissed. In light of these considerations, this

court does not find dismissal without prejudice on the basis that Toran did not exhaust administrative remedies legally sound or well-reasoned."); *Oakes v. Dep't of Pub. Safety*, No. CV GLR-14-2002, 2016 WL 6822470, at \*5 (D. Md. Nov. 18, 2016) ("At bottom, the Court concludes [the plaintiff] exhausted his administrative remedies because an IIU [precursor to IID[6]] investigation into [the plaintiff's] claims foreclosed the ARP process, rendering his administrative remedies unavailable."); *Brightwell v. Hershberger*, No. CV DKC 11-3278, 2016 WL 4537766, at \*9 (D. Md. Aug. 31, 2016) ("Because the existence of an IIU investigation shuts down the ARP process and thus exhausts administrative remedies for complaints that would typically fall within the ARP jurisdiction, Plaintiff met his burden to exhaust upon the initiation of that investigation.").

The cases that have found claims unexhausted despite the involvement of IID are distinguishable. In *Walker*, for example, IID was investigating a related but separate question, and "[n]either the Warden nor the Commissioner of Corrections rejected [the plaintiff]'s ARP grievance on the grounds that there was also an IID investigation," instead considering and denying it on the merits. *Walker v. W. Corr. Inst.*, No. CV TDC-15-2111, 2016 WL 3351565, at \*4 (D. Md. June 13, 2016). And, in *Shiheed v. Webb*, "[a] detective at IID was notified of the incident but no case number was assigned and IID did not take over investigation of the use of force." No. CV GLR-16-3166, 2019 WL 3220122, at \*8 (D. Md. July 16, 2019), *appeal dismissed*, No. 19-7547, 2019 WL 8504705 (4th Cir. Dec. 17, 2019). Thus, the ARP process remained available. In this case, however, IID investigated the September 19, 2019 incident, and Plaintiff's ARP complaint was dismissed on that basis.

---

[6] *See Montgomery v. Warden*, No. CV ELH-15-3005, 2017 WL 6368661, at \*4 (D. Md. Dec. 12, 2017); *Williams v. Dovey*, No. CV DKC-15-1891, 2016 WL 810707, at \*2 n.6 (D. Md. Mar. 2, 2016).

Indeed, although not directly relevant to Plaintiff's attempts to exhaust his administrative remedies, as it took place after the Complaint was filed, the March 11, 2020 denial of Plaintiff's IGO appeal on the basis of the ongoing IID investigation supports the Court's conclusion that the IID investigation prevented Plaintiff from further engagement in the ARP process. *See* ECF No. 13-6 at 20. Accordingly, because Plaintiff filed an ARP that was dismissed due to an ongoing IID investigation prior to filing the Complaint, summary judgment is precluded on the issue of exhaustion.

### B. Failure to State a Claim

#### 1. Failure to Protect

The main thrust of Hinton's claim is that Defendant Chronister failed to protect him from a known risk of harm in violation of the Eighth Amendment. The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). An inmate has an Eighth Amendment right to be protected from violence perpetrated by other prisoners. *Danser v. Stansberry*, 772 F.3d 340, 346 (4th Cir. 2014). "Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)).

In connection with a failure to protect claim, courts apply the two-pronged analysis outlined in *Farmer*, 511 U.S. 825. *See Perry*, 2019 WL 1040545, at *3 (applying *Farmer* to a pretrial detainee's failure to protect claim); *Brown v. Harris*, 240 F.3d 383, 388–90 (4th Cir.

2001) (same). First, "[f]or a claim based on a failure to prevent harm, a person must show that he is being detained or incarcerated 'under conditions posing a substantial risk of serious harm.'" *Brown* 24 F.3d at 389 (quoting *Farmer*, 511 U.S. at 834). Second, a plaintiff must establish that the prison official involved had "a sufficiently culpable state of mind," which, in this context, "is one of deliberate indifference to inmate health or safety." *Farmer*, 511 U.S. at 834 (internal quotation marks and citations omitted). This subjective inquiry requires evidence that the official had actual knowledge of an excessive risk to the prisoner's safety—"the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. A plaintiff may "prove an official's actual knowledge of a substantial risk 'in the usual ways including inference from circumstantial evidence,'" and "'a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Raynor v. Pugh*, 817 F.3d 123, 128 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 842).

However, even where prison officials had actual knowledge of a substantial risk and where "the harm ultimately was not averted," the officials will not be liable if they "responded reasonably to the risk." *Farmer*, 511 U.S. at 844; *see also Stewart*, 2017 WL 665986, at *12. Moreover, "prison guards have no constitutional duty to intervene in the armed assault of one inmate upon another when intervention would place the guards in danger of physical harm." *Raynor*, 817 F.3d at 128 (quoting *Prosser v. Ross*, 70 F.3d 1005, 1008 (8th Cir. 1995)); *Thompson v. Virginia*, 878 F.3d 89, 108 (4th Cir. 2017) ("[P]rison officials are not liable if taking action would endanger their own lives or if the harm occurred despite their reasonable efforts to prevent it."). Still, while an official is not obligated to put himself at risk during an assault, prison officials may not "stands by as a passive observer," "completely fail[] to take *any*

action" to prevent the assault, or "simply refuse[]" to act despite having the reasonable opportunity to do so. *Raynor*, 817 F.3d at 128 (internal quotation marks and citations omitted). *Cf. Winfield v. Bass*, 106 F.3d 525, 532 (4th Cir. 1997) (en banc) (finding no deliberate indifference where unarmed prison officials did not intervene in an armed attack immediately but called for backup).

Here, Plaintiff has not alleged facts from which the Court could infer that Chronister had advanced knowledge of any risk that Oliver posed to Hinton. Additionally, Plaintiff recognizes that when Chronister saw Oliver moving in an aggressive manner toward Hinton, he followed Oliver to their cell. However, Chronister was alone, and Oliver had a weapon, so based on the exigencies of the situation and Chronister's training, rather than immediately intervene, Chronister secured the area and called for back-up. Under the circumstances, Chronister's reaction to the spontaneous assault on Hinton was reasonable and does not indicate that he was deliberately indifferent to a substantial risk to Hinton's safety. Accordingly, Plaintiff has failed to state a claim that Chronister failed to protect him in violation of the Eighth Amendment.

### 2.  PREA Claim

To the extent that Plaintiff seeks to impose liability on Defendants under the Prison Rape Elimination Act, 34 U.S.C. § 30301 *et seq.*, he fails to state a cognizable claim because inmates do not have a right to sue under the PREA. Congress intended, with the enactment of the PREA "[t]o provide for the analysis of the incidence and effects of prison rape in Federal, State, and local institutions and to provide information, resources, recommendations, and funding to protect individuals from prison rape." PREA, Pub. L. No. 108-79, 117 Stat. 972 (2003). Nothing in the PREA suggests that Congress intended to create a private right of action for prisoners to sue for non-compliance. *See Williams v. Dovey*, No. DKC-15-1891, 2016 WL 810707, at *7 (D. Md.

Mar. 2, 2016) (listing cases). Accordingly, any claims associated with alleged PREA violations are subject to dismissal.

### 3. Criminal Prosecution of Oliver

To the extent Hinton seeks to press criminal charges against Oliver, he must do so by addressing his complaint to the appropriate State authorities with jurisdiction to prosecute the crime. Hinton, however, has no legally protected interest in the prosecution of others. The Supreme Court said in *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973): "[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *See also, e.g.*, *Singfield v. Smith*, No. CV GLR-19-2030, 2021 WL 1087062, at *3 n.7 (D. Md. Mar. 19, 2021) ("Singfield has no cause of action related to the failure to criminally prosecute his assailant or Defendants. Allegations of criminal violations may only be initiated by a prosecutor."); *Jones-harris v. Warden John Wolfe Officer Nudukwe Onuma*, No. CV ELH-15-354, 2015 WL 7776935, at *1 (D. Md. Dec. 2, 2015) ("[T]he Court has no authority to grant Jones-Harris's request . . . for criminal prosecution of defendant and the three prisoners who stabbed him."). Accordingly, this claim is also subject to dismissal.

### 4. Eastern Correctional Institution

Finally, any claims Hinton brings against ECI fail because they are barred by Eleventh Amendment immunity. ECI is part of the Maryland Department of Public Safety and Correctional Services, which is a "principal department of the State government." Md. Code Ann., Corr. Servs. § 2-101. Under the Eleventh Amendment to the United States Constitution, absent consent, a state, its agencies, and departments are immune from suits in federal court brought by its citizens or the citizens of another state. *See Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) ("It is clear, of course, that in the absence of consent a suit

in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."). While the State of Maryland has waived its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann., State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. "A State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst*, 465 U.S. at 99. Thus, Hinton's claims against ECI, a state agency, are barred by the Eleventh Amendment and will be dismissed. *See, e.g.*, *Waddell v. E. Corr. Inst.*, No. CV TDC-19-0232, 2020 WL 5423903, at *3 (D. Md. Sept. 10, 2020); *Lattisaw v. E. Corr. Inst.*, No. CV CCB-15-2040, 2016 WL 3940186, at *4 (D. Md. July 21, 2016).[7]

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss, or in the Alternative, Motion for Summary Judgment is granted. A separate Order follows.


Date: <u>May 31, 2021</u>                              ___/s/_____
                                                        GEORGE J. HAZEL
                                                        United States District Judge

---

[7] In light of the Court's ruling, an analysis of the Defendants' remaining arguments is not necessary.